[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JULY 17, 2002
THOMAS K. KAHN
CLERK

_____

No. 00-14592

_____

D. C. Docket No. 97-08051 CR-ASG

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

MARVIN HERSH,
a.k.a. Mario,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

**(July 17, 2002)**

Before ANDERSON and MARCUS, Circuit Judges, and MIDDLEBROOKS*,
District Judge.

MARCUS, Circuit Judge:

Marvin Hersh appeals his multi-count convictions and 105-year sentence for

transporting a minor in foreign commerce with the intent to engage in criminal

sexual activity, in violation of 18 U.S.C. § 2423(a), conspiracy to travel in foreign

---

*Honorable Donald M. Middlebrooks, U.S. District Judge for the Southern District of
Florida, sitting by designation.

commerce with the intent to engage in sexual acts with minors, in violation of 18 U.S.C. § 2423(b), receiving and possessing material containing visual depictions of minors engaged in sexually explicit conduct, in violation of 18 U.S.C. §§ 2252(a)(2) and 2252A(a)(5)(B), making a false statement, in violation of 18 U.S.C. § 1001(a)(2), making false statements in the application and use of a passport, in violation of 18 U.S.C. § 1542, and harboring an illegal alien, in violation of 8 U.S.C. § 1324(a)(1)(A) and (B).

Hersh raises four main arguments on appeal: (1) that the district court erred by allowing joinder of the child pornography counts and the travel and transport counts; (2) that the district court erred by denying Hersh's motion to dismiss the travel count on grounds that it contravenes ex post facto principles; (3) that the district court erred by treating the travel count as eight separate sentencing guidelines groups; and (4) that the district court abused its discretion by imposing a "prophylactic" upward departure. After thorough review of the record and the parties' arguments, we find no reversible error and affirm both Hersh's convictions and sentence.[1]

I.

The evidence, introduced at trial, describes at length Hersh's elaborate efforts to engage in multiple sexual encounters with young, poverty-stricken boys, mainly from Third World countries. This sordid story of sexual predation begins in the early 1990s, when Marvin Hersh, a college professor, traveled to Honduras

---

[1]The panel would like to commend defense counsel for taking this court appointment and for the vigor and quality of her representation.

and approached a seventeen- or eighteen-year-old boy, Moises, in hopes of providing him with food and clothing in exchange for sex. When Moises met Hersh, he was "very hungry" and agreed to accompany Hersh to a restaurant and then to a hotel where he allowed Hersh to perform oral sex on him.

Hersh later asked if Moises had brothers, and Moises took Hersh to his house to meet his younger brothers. While at the house, Hersh asked their mother for permission to travel with the boys. The mother, who had little education, if any, and who was unaware of Hersh's intentions to have sex with her sons, gave permission. Over time, Hersh had repeated sexual encounters, including oral sex, with Moises, in return for clothing and other gifts. Hersh began having similar sexual relations with each of Moises's younger brothers, Juan, Erlin, and David. Juan explained that he wanted to meet Hersh "[b]ecause I thought that he was one of God's marvels and with all that he had given to Moises, maybe he could give something to me, too." Juan further explained that he engaged in sexual relations with Hersh "[d]ue to the poverty, I had the need and I wanted [Hersh] to help my family out." Likewise, Erlin testified that he succumbed to Hersh's requests because "as humble and poor people that we are, I thought that . . . by doing that . . . for some while we would suffer directly, but later on our family may change."

Hersh also traveled to Thailand in the early 1990s, where he met Nelson Buhler, who was there to meet young men. Hersh showed Buhler how to find child pornography on the internet, using a Zip disk to hold large amounts of pornography in encrypted form, which could easily be destroyed if authorities

3

came to search. In addition, Hersh boasted to Buhler about his sexual activity with minor males in the United States and abroad, and encouraged Buhler to travel to Honduras where it was "very easy" to procure boys under eighteen whose love was "unconditional." In particular, Hersh told Buhler about his sexual relations with Moises and his brothers.[2]

On November 24, 1994, Buhler traveled with Hersh to Honduras to meet Moises and his brothers. Upon arriving at the airport, Hersh and Buhler were met by Moises, Juan, and Erlin. The group traveled to several hotels, where Hersh stayed with Moises and Juan, and Buhler stayed with Erlin. During these nights, Hersh again engaged in sexual activities with Moises and Juan, as he had in the past. Buhler and Erlin also engaged in sexual activities, once they became better acquainted. At one point, Hersh told Erlin that Buhler was upset that Erlin would not do what Buhler wanted, and Hersh directed Erlin to perform oral sex on Buhler "three times a day, in the morning, I think by noon, and in the evening."

Hersh and Buhler made subsequent trips to Honduras on December 29, 1994, February 2,1995, April 27, 1995, June 8, 1995, and December 27, 1995, and Hersh traveled to Honduras alone on March 2, 1995 and May 25, 1995. During these trips, Buhler would choose Erlin, and Hersh would choose one or some of the other boys, to take to Honduran hotels to engage in oral sex. Over time, Hersh appeared to lose interest in Moises, and to prefer to bring along Juan or David.

---

[2]Buhler wrote down Hersh's estimated ages of the boys on a slip of paper, noting that Moises was 14, Erlin was 13, Ronnie was 11, David was 10, and Juan was 11. Ronnie was not a brother of the other boys, and according to Buhler, Hersh refrained from pursuing Ronnie, because his mother, who was educated and held a higher social status, would cause "big trouble."

Juan was described as Hersh's "favorite," and repeatedly was subjected to sexual relations with Hersh, who directed Juan to engage in oral sex and touch his private parts, "the same things as usual." David, the youngest, was about ten years old when his sexual encounters with Hersh began. Hersh performed oral sex on David "every time he took me to the hotel," but David performed oral sex on Hersh only once.

In exchange for these repeated sexual encounters, Hersh and Buhler contributed money and gifts to the boys' family. The boys had been living in what Buhler described as "unbelievable poverty," in a one-room, thatched roof, dirt floor house made out of palm leaf, with about fourteen people living in it. Hersh and Buhler agreed to each contribute thirty-seven dollars per month in rent for a new house for the family.[3] Hersh and Buhler also provided the boys with hotel facilities, clothes, money and gifts, and gave their mother money.

In total, Hersh and Buhler made approximately six trips to Honduras in 1994 and 1995. And Hersh also made two trips alone in 1995. During one trip, Hersh told the boys' parents that the boys would have many educational advantages if they moved with him to the United States. In August 1995, the parents allowed fifteen-year-old Juan to travel to the United States with Hersh. In preparation, Hersh had traveled to California and obtained a false birth certificate for Juan in

---

[3]Initially, Hersh was opposed to contributing rent money for a new house for the family. He told Buhler that "he had no interest in really doing anything substantial for the family. His interest was Juan . . . and if anything was to be done for the family, that was up to [Buhler]." Eventually, he agreed to "go in . . . on this house," but told Buhler that "anything else [like furnishing or food] is totally up to [Buhler]."

5

the name of John Anthony Hersh, born in 1985. Hersh also had applied for a U.S. passport in the name of John Anthony Hersh, listing Juan as his son born in Los Angeles, and had applied for a social security card for Juan in the name of John Anthony Hersh, again listing Juan as an American citizen and the son of Marvin Hersh.

While Juan was living in Hersh's Boca Raton, Florida home, Juan slept in Hersh's bed and lived in the master bedroom with Hersh. Hersh and Juan engaged in sexual relations two to three times a week. During Juan's time there, the defendant showed Juan several pictures of naked people on Hersh's computer, including the boy star of "Home Alone," McCauley Culkin, and a woman seated on top of a metal penis.

In 1996, the Florida Department of Children and Families ("DCF") received reports on Hersh and placed him under state investigation for sexually abusing Juan. Hersh agreed to be interviewed, stating that he believed Juan to be his son after an affair with the boy's mother, and denying all allegations. Hersh also consented to a search of his home, where investigators discovered a suitcase of hand-drawn maps referencing where to find young boys in poor countries and pictures of boys naked from the waist up. A subsequent search of his residence uncovered evidence of computer images of minor males engaged in sexual activities.[4] Further investigation revealed evidence of other instances of Hersh's

---

[4]Several computer files containing child pornography were found in Hersh's residence: (1) three recovered computer files with viewable images found on the C-drive of Hersh's computer, and (2) encrypted files found on a high-capacity Zip disk. The images on the Zip disk had been encrypted by software known as F-Secure, which was found on Hersh's computer. When agents

sexual molestation of boys as young as eight years old.[5]

Soon after the search of his home, a state court judge removed Juan from Hersh's home, placing the boy in protective care. Hersh then called Buhler from a pay phone warning him not to call. Hersh called Buhler later to tell him that he had removed incriminating evidence from his home so the agents only found one suitcase. He also related his confidence that Juan, who had rehearsed the story in advance, would lie to the authorities and return to Hersh. Hersh was arrested soon thereafter.

The defendant was charged by a federal grand jury, sitting in the Southern District of Florida, with (1) transporting a minor in foreign commerce with the intent to engage in an illegal sexual activity, in violation of 18 U.S.C. § 2423(a) (Counts 1 and 2); (2) making a false statement, in violation of 18 U.S.C. § 1001(a)(2) (Count 3); (3) making false statements in the application and use of a

---

could not break the encryption code, they obtained a partial source code from the manufacturer that allowed them to interpret information on the file print outs. The Zip disk contained 1,090 computer files, each identified in the directory by a unique file name, such as "sfuckmo2," "naked31," "boydoggy," "dvsex01, dvsex02, dvsex03," etc., that was consistent with names of child pornography files. The list of encrypted files was compared with a government database of child pornography. Agents compared the 1,090 files on Hersh's Zip disk with the database and matched 120 file names. Twenty-two of those had the same number of pre-encryption computer bytes as the pre-encrypted version of the files on Hersh's Zip disk.

The jury saw the three images found on Hersh's C-drive, but, because of Hersh's objection to the 22 images encrypted on the Zip disk, and the district court's concern over their inflammatory nature, those images were only described by Dr. Colaizzo, a government witness.

[5]Evidence was also presented at trial revealing Hersh's 1984-90 sexual involvement with a boy from a low-income neighborhood of Atlanta, who lived with Hersh for five years; his mid-1980's involvement with two boys from a very poor village in the Dominican Republic, and with one boy from Mexico; and his 1990-94 involvement with a minor Honduran male, unrelated to Moises and his brothers. Again, Hersh engaged in sexual relations with each of these boys, and gave them and their families food, money or other presents in return.

7

passport, in violation of 18 U.S.C. § 1542 (Count 4); (4) harboring an illegal alien, in violation of 8 U.S.C. § 1324(a)(1)(A) and (B) (Count 5); (5) receiving visual depictions of minors engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252(a)(2) (Counts 6-8); (6) possessing material containing visual depictions of minors engaged in sexually explicit conduct, in violation of 18 U.S.C. § 2252A(a)(5)(B) (Count 9); and (7) conspiring to travel in foreign commerce with the intent to engage in sexual acts with minors, in violation of 18 U.S.C. § 2423(b) (Count 10).[6]

Before and during trial, Hersh moved to sever the child pornography counts and to dismiss the travel count, and objected to the introduction of bad character evidence, but the district court denied these requests. After a lengthy trial, Hersh was found guilty by a jury on all ten counts.

A presentence investigation report ("PSI") was prepared for sentencing. Based on the information in the PSI, the probation officer recommended dividing Hersh's ten-count indictment into fifteen separate groups.[7] The officer then assigned the following sentencing guidelines calculations to the groups: Groups 1 and 2 (representing Counts 1 and 2, respectively) received recommended adjusted offense levels of 27 each; Group 3 (representing Counts 3-5) received a

---

[6]Hersh's co-conspirator, Buhler, pled guilty to conspiracy, receiving a substantial assistance agreement in exchange for his testimony against Hersh.

[7]Under the sentencing guidelines, all counts involving "substantially the same harm" are placed together into a single group, and one offense level is assigned to each group. U.S.S.G. § 3D1.2. Additionally, we note that Hersh was sentenced pursuant to the 1998 version of the sentencing guidelines, and those are the guidelines on which we rely in this opinion.

8

recommended adjusted offense level of 27; Groups 4-6 (representing Counts 6-8, respectively) received recommended adjusted offense levels of 26 each; Group 7 (representing Count 9) received a recommended adjusted offense level of 23; Groups 8 and 15 (representing the first and last dates of travel in Count 10, respectively) received recommended adjusted offense levels of 21 each; and Groups 9-14 (representing each of the intermediate travel dates in Count 10, respectively) received recommended adjusted offense levels of 37 each.[8]

---

[8]In detail, the probation officer's guidelines recommendations were as follows:  Groups 1 and 2 addressed Counts 1 and 2, respectively, and received base offense levels of 14 pursuant to § 2G1.1(a).  Group 3 addressed Counts 3, 4, and 5 because these offenses were closely related counts under § 2L2.2(c)(1)(A), and received a base offense level of 14.  For Groups 1, 2 and 3, the probation officer recommended a 7-point upward adjustment under § 2G1.1(b)(2)(B) for victim age, a 2-level increase under § 2G1.1(b)(3)(B) for victim custody, a 2-level increase for victim vulnerability under § 3A1.1(b)(1), and 2-level increase for obstruction of justice under § 3C1.1.  In sum, the recommended adjusted offense levels for Groups 1, 2, and 3 were 27 each.

For Counts 6-8 (Groups 4-6, respectively), the probation officer assigned a base offense level of 17 pursuant to § 2G2.2.  The probation officer added a 2-level increase for obstruction of justice under § 3C1.1, a 5-level increase for a pattern involving sexual abuse of a minor under § 2G2.2(b)(4), and a 2-level increase because a computer transmitted the materials, under § 2G2.2(b)(5).  For Count 9, or Group 7, the probation officer assigned a base offense level of 15 pursuant to § 2G2.4.  The probation officer added a 2-level increase for obstruction of justice under § 3C1.1, a 2-level increase because a computer transmitted the materials under § 2G2.4(b)(3), a 2-level increase because the material involved a minor under the age of 12, pursuant to § 2G2.4(b)(1), and a 2-level increase because the material involved 10 or more visual items, under § 2G2.4(b)(2).  As a result, Groups 4-6 received recommended adjusted offense levels of 26 each, and Group 7 received a recommended adjusted offense level of 23.

For Count 10, the probation officer recommended counting each round trip as its own group.  Thus, Count 10, involving eight separate trips, encompassed eight separate groups for sentencing.  The first and last dates of travel (November 24, 1994 and December 27, 1995) became Group 8 and Group 15, respectively, and each received a base offense level of 15 under § 2A3.2(a).  The probation officer added a 2-level increase under § 2A3.2(b)(1) for victim custody, a 2-level increase for victim vulnerability under § 3A1.1(b)(1), and a 2-level increase under § 3C1.1 for obstruction of justice, giving Groups 8 and 15 each adjusted offense levels of 21.

The remaining groups, Groups 9 through 14, related to travel from December 1994 to June 1995, and received base offense levels of 27 each under § 2A3.1(a).  These groups received different levels from Groups 8 and 15 because of victim age.  (Juan's younger brother, David, was not involved in the first trip and had turned 12 by the last trip.  Accordingly, the levels for

Applying the multiple-count adjustment of U.S.S.G. § 3D1.4, the probation officer calculated the greater adjusted offense level at 37, with a 5-level increase reflecting Groups 9 through 14, for a combined adjusted offense level of 42. Recommending no further enhancements or adjustments, the probation officer calculated the total offense level at 42. Given Hersh's criminal history category of I, the sentencing range was 360 months' to life imprisonment. The probation officer noted, however, that a departure may be warranted based on the fact that many of the convictions would be disregarded in the multiple-count adjustment, and that the prior enhancements may not adequately reflect the seriousness of Hersh's actions.

Hersh filed objections to the PSI, raising the argument that the calculations were incorrect because they divided Count 10 into eight separate groups despite the fact that Hersh was convicted of only one conspiracy and that only one date of travel occurred after the enactment of the statute he violated. Hersh also argued that there were no grounds for an upward departure because the guidelines adequately considered the seriousness of the offense.[9] The district court overruled

---

the middle trips reflected those of the more serious offense of sexual abuse of a minor under 12.) The probation officer added a 4-level increase under § 2A3.1(b)(2)(A) because a victim was under 12, a 2-level adjustment under § 2A3.1(b)(3)(A) for victim custody, a 2-level adjustment under § 3A1.1(b)(1) for victim vulnerability, and a 2-level increase for obstruction of justice under § 3C1.1. Thus, Groups 9 through 14 each received adjusted offense levels of 37.

[9]Hersh also contested the vulnerable victim and obstruction of justice enhancements before the district court, but concedes these issues on appeal. With regard to these enhancements, the district court found that Hersh "targeted children living in third world countries, in extreme poverty" who, because of their families' "abject poverty . . . which most American citizens could not fathom," were easily susceptible to his "manipulation." The court also found that Hersh had coached Juan to give false information about their relationship; produced a false map to the home of Juan's family; produced a false birth certificate listing Hersh as Juan's father; made

10

Hersh's objections, finding that the PSI calculations for Count 10 were correctly applied, and finding that, even if this Court remanded the case due to an error in the sentencing calculations, the district court would apply an upward departure to reach the same sentence. Within the resulting sentencing range of 360 months' to life imprisonment, the district court sentenced Hersh to 105 years. This appeal followed.

## II.

On appeal, Hersh contests both the convictions and the sentence imposed by the district court. We are not persuaded by Hersh's arguments.

## A.

First, Hersh argues that the district court erred in allowing joinder of the child pornography counts and the travel and transport counts. We undertake a two-step analysis to determine whether separate charges were properly tried at the same time. See United States v. Walser, 3 F.3d 380, 385 (11th Cir. 1993). First, we review de novo whether the initial joinder of charges was proper under Fed. R. Crim. P. 8(a). See id. Second, we determine whether the district court abused its discretion under Fed. R. Crim. P. 14 by denying the motion to sever. See id.

Hersh contends that joinder of the sets of charges was improper because the charges are distinct in subject and in time, and that there was no evidentiary overlap between them. Hersh's reading of Rule 8(a), however, is far too narrow. Rule 8(a) is construed broadly in favor of initial joinder, allowing joinder of

false statements about his foreign travel at his initial appearance; and deliberately encrypted child pornography images on the Zip disk to thwart authorities from accessing his hard drive.

11

offenses that "are of the same or similar character," even if such offenses do not arise at the same time or out of the same series of acts or transactions. Fed. R. Crim. P. 8(a); see also Walser, 3 F.3d at 385.[10] Indeed, Rule 8(a) is not limited to crimes of the "same" character but also covers those of "similar" character, which means "[n]early corresponding; resembling in many respects; somewhat alike; having a general likeness." Walser, 3 F.3d at 385 (quoting United States v. Werner, 620 F.2d 922, 926 (2d Cir. 1980)).[11] Moreover, when offenses are joined under Rule 8(a) by virtue of their "same or similar character," the offenses need only be similar in category, not in evidence. See United States v. Coleman, 22 F.3d 126, 133 (7th Cir. 1994).[12]

---

[10]This similarity can be apparent from the face of the indictment or by the government's representations before trial, if such representations are borne out in the evidence presented during trial. See United States v. Dominguez, 226 F.3d 1235, 1240-41 (11th Cir. 2000).

[11]The Second Circuit has also suggested that "requiring too precise an identity between the character of the offenses 'would fail to give effect to the word "similar" succeeding the word "same" and thus violate an elementary rule of statutory construction.'" Werner, 620 F.2d at 926 (quoting Edwards v. Squier, 178 F.2d 758,759 (9th Cir. 1949)).

[12]In Coleman, the court explained:

> This language in Rule 8(a) is a rather clear directive to compare the offenses charged for categorical, not evidentiary, similarities. . . . Simply put, if offenses are of like class, although not connected temporally or evidentially, the requisites of proper joinder should be satisfied so far as Rule 8(a) is concerned. . . . [W]e have refocused our joinder inquiry away from a balancing of time and evidence factors and toward a more literal reading of the Rule.

22 F.3d at 133-34 (emphasis in original) (footnotes and citations omitted). Indeed, the "same or similar character" standard may be satisfied even if the offenses are not of identical statutory origin. See id. at 133 n.10.

We disagree, however, with Hersh's assertion that these two sets of counts are not at all linked. For example, Hersh's co-conspirator Buhler, whose testimony was crucial to the travel and transport counts, also testified that Hersh taught him how to destroy computer files so that law enforcement agents could not find them. This testimony was important to establishing Hersh's knowledge in the child pornography counts. Likewise, Buhler testified that after Juan

We have employed Rule 8(a)'s "same or similar character" language several times, requiring that the charges be "similar" in category. In United States v. Cartwright, 632 F.2d 1290, 1293 (5th Cir. Unit A 1980), for example, we held that the joinder of two classes of offenses -- those involving the fraudulent misapplication of one corporation's funds and those involving false statements made to other lenders -- was proper even if they are not "connected together in any way," concluding that "the two classes of offenses are substantially similar in character because all of the offenses were crimes of deceit involving federally insured lending institutions." Id.[13] Likewise, in Walser, 3 F.3d at 385-86, we upheld the district court's refusal to sever a perjury and aiding and abetting count from counts alleging false and fraudulent statements made to a government agency, because even though the offenses charged were "distinct in time," the counts were "nonetheless similar," as each count of the indictment related "to the attempt -- or to the coverup of those attempts -- to obtain by fraud federal crop relief."

After thoroughly reviewing the record here, we are fully satisfied that both sets of counts are "similar" in that they reflect Hersh's repeated participation in the sexual exploitation of minors. Counts 1, 2 and 10 charge Hersh with traveling to and transporting a minor from Honduras for the specific purpose of engaging in

---

was removed from Hersh's home, Hersh told Buhler that he had gone to great lengths to make sure that nothing incriminating was at the house -- this is more evidence of Hersh's knowledge in the child pornography counts. Thus, there was indeed an evidentiary overlap between the counts.

[13]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

sexual activity with a minor; Counts 6-9 charge Hersh with receiving and possessing visual depictions of minors engaged in sexual activity. Collectively, the counts charge Hersh with child molestation and child pornography -- which plainly represent acts of "similar character" involving the extraordinary mistreatment of children. In fact, both Congress and the courts have acknowledged a link between these two offenses. See Child Pornography Prevention Act of 1996, Pub. L. No. 104-208, § 121, 110 Stat. 3009, *3009-26-27 (1996) (finding a strong link between pedophilic behavior and child pornography); Osborne v. Ohio, 495 U.S. 103, 111-12 & n.7, 110 S. Ct. 1691, 1696-97 & n.7, 109 L. Ed. 2d 98 (1990) ("A child who is reluctant to engage in sexual activity with an adult or to pose for sexually explicit photos can sometimes be convinced by viewing other children having 'fun' participating in the activity.") (citation omitted); United States v. Neal, 249 F.3d 1251, 1260-61 (10th Cir. 2001) (upholding the district court's sentence following a child pornography plea where the district court upwardly departed based on the defendant's molestation of three minors, since "his molestation is not 'totally irrelevant' to his child pornography possession"); United States v. Toler, 901 F.2d 399, 403 n.5 (4th Cir. 1990) ("A Senate Report discussing the child pornography law expresses the fear that unless the dissemination of child pornography is checked, it could contribute to a continuing cycle of child abuse.") (citing S. Rep. No. 95-438 (1977), reprinted in 1978 U.S.C.C.A.N. 43-46). Quite simply, based on the similarity of the offenses, we conclude that Hersh's charged offenses were

properly joined.[14]

Hersh nonetheless argues that even if the joinder was proper, the motion to sever was wrongly denied because compelling prejudice resulted from the joinder. "The test for assessing compelling prejudice is whether under all the circumstances of a particular case it is within the capacity of jurors to follow a court's limiting instructions and appraise the independent evidence against a defendant solely on that defendant's own . . . conduct in relation to the allegations contained in the indictment and render a fair and impartial verdict." Walser, 3 F.3d at 386-87. If so, "though the task be difficult," there is no compelling prejudice and reversal of the denial of the motion to sever is not warranted. Id. (citation omitted).

Specifically, Hersh says that the potential benefit of a joint trial was outweighed by the risk of jury confusion from the complex testimony regarding computers and by the prejudice that spilled over from the emotionally charged and inflammatory evidence of child pornography. He also argues that the district court's limiting instructions did not cure the spillover prejudice.

We are not persuaded by either claim. As an initial matter, a reasonable jury undoubtedly would have found both the evidence of Hersh's child molestation and the evidence of Hersh's child pornography very inflammatory, and Hersh has offered no support for the contention that the evidence of child pornography was

---

[14]But even if improper joinder occurred (and the record does not support the claim), reversal would still not be required if the misjoinder was harmless error, and thus did not result in actual prejudice that had "substantial and injurious effect or influence in determining the jury's verdict." United States v. Weaver, 905 F.2d 1466, 1477 (11th Cir. 1990) (citation omitted). We analyze Hersh's claims of prejudice next, in the severance discussion.

15

somehow more prejudicial or inflammatory than the charge that he repeatedly molested young, poverty-stricken boys from Third World countries. Nor has he offered support for the contention that the computer evidence related to the child pornography count actually confused the jury. Hersh merely proffers that the stigma of the child pornography charges must have impacted the jury's verdict on the remaining counts since the jury convicted Hersh on all counts after only five hours of deliberations following five weeks of trial. Yet, this fact is insufficient to mandate the conclusion that prejudice or jury confusion resulted. See Walser, 3 F.3d at 386 ("To justify reversal 'more than some prejudice must be shown; the appellant must demonstrate that he received an unfair trial and suffered compelling prejudice.' 'This is a heavy burden, and one which mere conclusory allegations cannot carry.'") (citations omitted).[15]

---

[15]Hersh further asserts prejudice in that the joinder of the counts forced him to present different defenses simultaneously and that the highly inflammatory nature of the child pornography counts created an obstacle to his taking the stand. We are not persuaded.

First, Hersh has failed to explain why presenting his two defenses at trial was contradictory. On the child pornography counts he argued that the evidence failed to establish his intent to receive or possess the images, while on the travel and transport counts he argued that the government's witnesses were coerced in their testimony with promises of deals and U.S. citizenship. While these defenses may be different, there is no reason to say that they are sufficiently contradictory to warrant severance.

Second, Hersh has failed to support the claim that he did not take the stand because of the inclusion of the child pornography charges. "[S]everance is not mandatory simply because a defendant indicates that he wishes to testify on some counts but not on others." United States v. Forrest, 623 F.2d 1107, 1115 (5th Cir. 1980) (citation omitted). Rather, to establish that the joinder of charges kept him from testifying, Hersh must show that the charges were distinct in time, place, and evidence, that there was "important" evidence that he might have offered on one set of charges but could not, and that he had a "strong need" not to testify on the other counts. United States v. Gardiner, 955 F.2d 1492, 1497 (11th Cir. 1992). Hersh has not made any of these necessary showings.

16

Additionally, we observe that the district court affirmatively and repeatedly acted to reduce any unfair prejudice resulting from the joinder. See id. at 387 ("[I]f the possible prejudice may be cured by a cautionary instruction severance is not required."). In particular, the court instructed the jury that the evidence related to the child pornography counts could be considered only insofar as it related to those counts; in describing each of the ten counts, the court reiterated that the jury could find guilt on a particular count only if the government met all of the elements for that count; and the court instructed the jury to ignore evidence of Hersh's character in reaching a verdict. In light of the many steps that the district court took to minimize prejudice, and in light of Hersh's failure to show any actual prejudice or jury confusion, we conclude that the jury was capable of following the court's limiting instructions and appraising the independent evidence against the defendant on each count. See id. ("'Absent evidence to the contrary, we presume that the jury was able to follow the court's instructions and evaluate the evidence against each defendant independently.'") (quoting United States v. Badia, 827 F.2d 1458, 1466 (11th Cir. 1987)).

In short, Hersh has failed to make the requisite showing that compelling prejudice resulted from the joinder, and we therefore hold that the district court did not abuse its considerable discretion in denying the motion to sever.[16] See id. at 385 (noting that we will not reverse the denial of a severance motion absent a clear

_____

[16]This conclusion is buttressed by our determination that the evidence as to each count fully supported a finding of guilt. See infra note 31; see also United States v. LaSpesa, 956 F.2d 1027, 1032 (11th Cir. 1992).

17

abuse of discretion resulting in compelling prejudice against which the district court offered no protection).

B.

Second, Hersh argues that the district court erred in denying his motion to dismiss the travel count on the ground that it contravenes ex post facto principles. We review de novo a defendant's claim that his conviction violates the ex post facto clause. See United States v. De La Mata, 266 F.3d 1275, 1285 (11th Cir. 2001).

The ex post facto clause prohibits the enactment of statutes that punish as a crime an act previously committed which was innocent when done. See id. at 1286. The ex post facto clause is not violated, however, when a defendant is charged with a conspiracy that continues after the effective date of the statute. See United States v. Terzado-Madruga, 897 F.2d 1099, 1124 (11th Cir. 1990) ("Since conspiracy is a continuous crime, a statute increasing the penalty for a conspiracy beginning before the date of enactment but continuing afterwards does not violate the ex post facto clause."); see also United States v. Paradies, 98 F.3d 1266, 1284 (11th Cir. 1996) ("There was sufficient evidence upon which the jury could have found that Jackson's fraudulent scheme began in 1985 but continued until the end of his tenure as a councilman (1990) . . . [T]he critical question is whether the law changes the legal consequences of acts completed before its effective date . . . Accordingly, Jackson's mail fraud convictions for conduct that continued after the effective date of [18 U.S.C.] § 1346 [(November 18, 1988)], do not violate the ex

18

post facto clause.") (citation and quotation omitted; emphases in original).

To prove the continuation of a conspiracy, the government may provide evidence showing that an overt act occurred after the amendment of the statute. See Huff v. United States, 192 F.2d 911, 915 (5th Cir. 1951) ("'If [co-conspirators] do continue such efforts in pursuance of the plan, the conspiracy continues up to the time of abandonment or success.' It is this reasoning which lies behind the recognized rule that the statute of limitations . . . runs from the last overt act during the existence of the conspiracy of which there is appropriate allegation and proof.") (citations omitted). An overt act is "something more . . . than evidence of a conspiracy[;] [i]t constitutes the execution or part execution of the conspiracy." Id.

In the instant case, Count 10 charged Hersh, under 18 U.S.C. § 2423(b), with conspiring with Buhler "to travel in foreign commerce for the purpose of engaging in sexual acts [with minors]." Eighteen overt acts "[i]n furtherance" of this conspiracy were alleged: seventeen acts of travel between Florida and Honduras from November 24, 1994 to January 1, 1996, and one act of paying rent for Juan's family in Honduras in the spring of 1995. However, § 2423(b), as applicable here, did not become effective until December 23, 1995, see Sex Crimes Against Children Prevention Act of 1995, sec. 5, § 2423(b), 109 Stat. 774, after which only two travel acts, consisting of one round-trip, were alleged to have occurred.

It is undisputed that Count 10 is constitutionally valid, as far as the ex post facto analysis is concerned, if the government proves that one overt act occurred after the amendment of the statute. See Terzado-Madruga, 897 F.2d at 1123-24.

19

Thus, the government was simply required to prove one overt act of the conspiracy occurring after December 23, 1995, and in our view, the act of travel accompanied by the intent to engage in sexual activity with a minor constitutes the requisite overt act in furtherance of this conspiracy.

We look to the elements of the offense described in the statute to determine whether an action constitutes an overt act.  See, e.g., United States v. Helmich, 704 F.2d 547, 549 (11th Cir. 1983) (noting that overt acts consist of those acts prohibited by the statute as well as other legal acts done in furtherance of the conspiracy).   The language of § 2423(b) provides:

> A person who travels in interstate commerce, or conspires to do so, or a United States citizen or an alien admitted for permanent residence in the United States who travels in foreign commerce, or conspires to do so, for the purpose of engaging in any sexual act (as defined in section 2246) with a person under 18 years of age that would be in violation of chapter 109A if the sexual act occurred in the special maritime and territorial jurisdiction of the United States shall be fined under this title, imprisoned not more than 15 years, or both.

18 U.S.C. § 2423(b) (emphasis added).  Using this language to ascertain the plain meaning of the statute, see United States v. Carrell, 252 F.3d 1193, 1198 (11th Cir. 2001) ("In statutory construction, 'the plain meaning of the statute controls unless the language is ambiguous or leads to absurd results.'") (citation omitted), we have little difficulty finding that a violation of § 2423(b) occurs when a person travels in foreign commerce for the purpose of engaging in any illegal sexual act with a minor.[17]  The statute does not require the government to prove that actual sexual

---

[17] The Second Circuit has read this statute in the same way.  In United States v. Han, 230 F.3d 560 (2d Cir. 2000), the court applied the statute in a situation where actual sexual activity never occurred, since the "minor" was an undercover police agent posing as a minor over the internet.

20

activity took place in Honduras. The government was required to prove, and did establish, that Hersh had formed the intent to engage in sexual activity with a minor when he crossed state lines after December 23, 1995.[18]

Finding that the defendant had formed the necessary intent prohibited by § 2423(b) by developing a plan to cross state lines to engage in sexual acts with the minor, the court held that little more than crossing state lines with an intent to engage in sexual acts with a minor is sufficient to violate the statute. See id. at 563; see also United States v. Brockdorff, 992 F. Supp. 22, 24-25 (D.D.C. 1997) (upholding as constitutional § 2423(b) even though the statute requires no overt act other than "crossing a state line with an intent to commit a serious crime").

[18]Hersh contends, nevertheless, that this interpretation of the law cannot now be applied on grounds that the government took a different position in the indictment, at trial, and in the jury instructions. We disagree with Hersh's portrayal of the government's position.

First, Hersh claims that the indictment requires the sex to have occurred in Honduras, when it states that Hersh and Buhler conspired to travel in foreign commerce for the purpose of engaging in sexual acts with minors "that would be in violation of Chapter 109A of Title 18, United States Code, if the sexual acts occurred in the special maritime and territorial jurisdiction of the United States." Contrary to Hersh's argument, the indictment carefully tracks the language of the statute, making no statement about where the sex actually occurred. It also makes clear that Hersh and Buhler need only have formed the intent to engage in sexual activity with a minor when they traveled.

Second, Hersh claims that the government understood Count 10 throughout trial to mean that actual sex with a minor was committed in Honduras. In support of this argument, he proffers three statements by the government at trial: (1) "Count 10 of the indictment . . . charges . . . that the Defendant, Marvin Hersh, conspired with another individual named Nelson J. Buhler to travel to the Country of Honduras for illegal sexual purposes with minors;" (2) "the Count 10 conspiracy [has] to do with traveling for the purpose outside, you know, either across the state line or foreign line, engaging in such conduct;" and (3) "the only way to prove intent in a case like this is to prove the act, and particularly the continuing pattern." These statements do not support Hersh's argument. If anything, the comments by the government at trial recognized that it was Hersh's intent, and not the commission of the act, that mattered. In fact, at one point in the trial, the district court commented, and the government agreed, that the essence of the charge of Count 10 was that it was Hersh's "intent to do this at the time he traveled, that is, to engage in custodial sexual battery at a subsequent date."

Finally, Hersh claims that the jury instructions, which he concedes were proper, required the jury to find that sexual activity occurred in Honduras on the December 27, 1995 trip. In the jury instructions, the district court stated that the jury must find "beyond a reasonable doubt," among other things, that: (1) The common and unlawful plan was to travel in foreign commerce to engage in a sexual act with a minor; and (2) One of the conspirators during the existence of the conspiracy knowingly committed at least one of the following overt acts: (i) traveled from Florida to Honduras on or about December 27, 1995; and (ii) traveled from Honduras to Florida, on or about January 1, 1996. In addition, the jury instructions defined overt act as "any transaction or event, even one which may be entirely innocent when considered alone, but which is knowingly committed by a conspirator in an effort to accomplish some object of the

21

Indeed, the government proved that Hersh had formed the necessary intent to sustain the conspiracy count when he traveled on the December 1995 trip. As the jury instructions clarified, the jury was required to find that (1) Hersh willfully joined into the plan, knowing its unlawful purpose of traveling in foreign commerce to engage in a sexual act with a minor; (2) at least one of the overt acts of travel occurred after the effective date of the amended statute; and (3) the overt act of travel was "knowingly committed . . . in an effort to accomplish some object of the conspiracy." The evidence relevant to these instructions included: (1) the testimony of Buhler and Juan's younger brother, David, establishing that Hersh and Buhler traveled from Florida to Honduras for four days, from December 27 to January 1, that during that trip they met with members of Juan's family, and that they returned to Florida with Juan; (2) the testimony of Buhler, Juan, and David, establishing that Hersh regularly engaged in sexual acts with minors during his trips to Honduras;[19] and (3) the testimony of Juan, establishing that "the same sort

conspiracy." (Emphasis added). As made clear by this language, the jury instructions explicitly required the jury to find that Hersh willfully joined the plan, knowing its unlawful purpose of traveling in foreign commerce to engage in a sexual act with a minor. They also required the jury to find that either Hersh or Buhler traveled to or from Honduras after December 23, 1995. The jury instructions did <u>not</u>, however, require the jury to find that actual sexual activity occurred in Honduras on the December 1995 trip; therefore, Hersh's argument must fail.

For these reasons, neither the indictment, statements at trial, nor the jury instructions indicated that the government must prove that Hersh actually completed sexual activity with a minor in Honduras on the December 1995 trip. On the contrary, the government's position in all three instances made clear that the government was simply required to prove that Hersh had formed the intent to engage in sexual activity with a minor when he crossed state lines on December 27, 1995 -- not only is the government's position in all three instances consistent with its position on appeal, but it also represents an accurate view of the law, as discussed above.

[19]In particular, Buhler testified that Hersh told him that he slept with Juan on each trip to Honduras. Juan also testified to as much, stating that the same sexual activities, including oral sex and "touching," occurred during Hersh's trips to Honduras. David likewise testified that he

22

of sexual activities [described] earlier [took] place" when they returned to Florida from the December 1995 trip. Plainly, Hersh's "intent" during the December 1995 trip was proven by the recitation of sexual activities with minors that Hersh usually engaged in while in Honduras. His intent was further established by the fact that upon returning from Honduras to Florida, he continued to engage in sexual activities with Juan, a minor. Together, the above evidence plainly shows that Hersh traveled to Honduras with the intent to engage in sexual activity with a minor. See United States v. Kent, 175 F.3d 870, 873 (11th Cir. 1999) (holding that in reviewing whether there is sufficient evidence to support a conviction, we view "the evidence in the light most favorable to the Government and draw[] all reasonable inferences and credibility choices in favor of the jury's verdict").

In short, because the government proved that the overt act of travel with the intent to engage in sexual acts with minors occurred after December 23, 1995, the conspiracy lasted past the statute's amendment, and no ex post facto concerns exist.

## C.

Third, Hersh argues that the district court erred at sentencing by treating Count 10, the travel count, as eight separate sentencing guidelines groups. We review the district court's application and interpretation of the sentencing guidelines de novo. See United States v. Harness, 180 F.3d 1232, 1234 (11th Cir.

_____

engaged in sexual activity with Hersh on each of the Honduras trips, and that he remembered Hersh's December 1995 trip. Hersh incorrectly contends that David testified to such information only at sentencing. On the contrary, during the direct examination of David at trial, the boy testified that "every time he took me to the hotel" Hersh performed oral sex on him.

23

1999).

The sentence for Count 10 was calculated in the following way. Applying the grouping provisions of U.S.S.G. §§ 1B1.2(d) and 3D1.2, comment. (n.8), the district court divided Count 10 into eight sentencing guidelines groups, treating the eight trips to Honduras as separate offenses in fashioning Hersh's sentence. The district court then adopted the PSI recommendations to assign group adjusted offense levels as follows: (1) level 37 to each of the middle six trips (with base offense levels of 27); and (2) level 21 to the first and last trips (with base offense levels of 15). By operation of § 3D1.4, these eight trips generated a combined-offense level of 42. Based on the groups and the defendant's criminal history category of I, the results yielded an imprisonment range of 360 months' to life.

Hersh says that it was error to divide the sentence for Count 10 into eight different groups based on the eight trips because: (1) he was charged and convicted of a single-object conspiracy and should have been sentenced as such; and (2) many of the trips occurred before the statute's amendment and thus cannot be the bases for the imposition of punishment under the ex post facto clause. Based on the language of the indictment and the application of the sentencing guidelines thereto, we agree with Hersh that the district court erred in dividing Count 10 into eight separate groups for sentencing purposes. We further find, however, that this error was harmless.

There are two provisions of the sentencing guidelines that allow a sentencing court to divide a count into several groups for sentencing, but neither is applicable

24

here. Under the first provision, U.S.S.G. § 3D1.2, a sentencing court may treat a conspiracy count as if it were several counts, each one charging conspiracy to commit one of the substantive offenses, when a defendant is convicted of conspiring to commit several substantive offenses and also convicted of committing one or more of the underlying substantive offenses. See U.S.S.G. § 3D1.2, comment. (n.8). While Hersh was convicted of a conspiracy to travel offense in Count 10, he was not also convicted of any substantive travel offenses.[20] As a result, this guideline provision does not apply to Hersh, and he should not have been sentenced separately based on this provision.

Under the second provision, U.S.S.G. § 1B1.2(d), a sentencing court may treat a conspiracy count as if it were separate counts, sentencing a defendant based on each offense that the defendant conspired to commit, when the defendant is convicted of a multi-object conspiracy. See U.S.S.G. § 1B1.2(d). In United States v. Riley, 142 F.3d 1254, 1257 (11th Cir. 1998), however, we held that defendants are not guilty of multi-object conspiracies under U.S.S.G. § 1B1.2(d) when a conspiracy involves the commission of "one crime in two ways." Id. (citation omitted).[21]

_____

[20]The substantive offenses for which Hersh was convicted in Counts 1 and 2 involve the transportation of a minor in foreign commerce with the intent to engage in sexual activities, see 18 U.S.C. § 2423(a). The conspiracy charge in Count 10 involves Hersh's own travel, see 18 U.S.C. § 2423(b), not the transportation of others. Thus, Counts 1 and 2 do not represent the substantive offenses of Count 10.

[21]In Riley, the jury found the defendants guilty of conspiracy to possess cocaine and crack. 142 F.3d at 1255. On appeal, we found that the defendants were not guilty of a multi-object conspiracy, but rather, were guilty of a single conspiracy that could have occurred by either the conspiracy to possess cocaine or the conspiracy to possess crack. Id. at 1257. In so holding, we distinguished United States v. McKinley, 995 F.2d 1020, 1022 (11th Cir. 1993), where the

In the instant case, Hersh was convicted of one count of conspiracy to travel in foreign commerce with the intent to engage in sexual acts with minors. The purpose of Hersh's conspiracy, according to the indictment, was to "travel in foreign commerce for the purpose of engaging in sexual acts [with minors]" in violation of one statute, 18 U.S.C. § 2324(b). The indictment further alleged that "[i]n furtherance of this conspiracy and to effect the objects thereof, there were committed, by at least one of the co-conspirators herein . . . at least one of the following overt acts." Although the indictment used the plural "objects," the indictment did not state anywhere what any objects of the conspiracy might have been, other than traveling in foreign commerce for the purpose of engaging in sexual acts with a minor. Therefore, based on the indictment itself, we are constrained to conclude that only a single act conspiracy was alleged in this case.[22] Accordingly, the district court erred in dividing Count 10 into eight separate sentencing guidelines groups.

Moreover, not only was the sentence for Count 10 improper because it

defendants were charged with conspiring to commit two offenses prohibited by two different statutes -- conspiring to transport and receive a Stinger missile with the intent to injure persons and property (in violation of 18 U.S.C. § 844(d)) and conspiring to export the missile and other weapons without required licenses (in violation of 22 U.S.C. § 2778). In Riley, on the other hand, the conspiracy alleged violated 21 U.S.C. § 841(a) by possessing with intent to distribute a controlled substance, and we thus found that the conspiracy only had one object.

[22]The government nonetheless argues that the district court could properly divide Count 10 into eight groups based on the findings the jury made pursuant to the jury instructions. The jury instructions required the jury to find that one of the co-conspirators either (i) traveled from Dade County, Florida, to Honduras on or about December 27, 1995, or (ii) traveled from Honduras to Dade County, Florida, on or about January 1, 1996. While the jury had to find guilt as to one of those two travel dates, it did not have to find Hersh guilty of the other seven round trips. Therefore, contrary to the government's argument, the language of the jury instructions merely required the jury to convict based on a single object in Hersh's conspiracy.

26

erroneously treated Hersh's conspiracy as multi-object, but it was also improper because it sentenced him separately based on events that occurred before the statute's amendment, in violation of the ex post facto clause. Had the district court sentenced Hersh on Count 10 for one overarching conspiracy, comprised of the various dates of travel, there would be no ex post facto concern, since, as we've discussed already, there is no ex post facto violation in Hersh's conviction for the conspiracy spanning the amendment of 18 U.S.C. § 2423(b). See Terzado-Madruga, 897 F.2d at 1123-24. But this is not what the district court did. Instead, Hersh was sentenced for one conspiracy that straddled the effective date of the statute, and at the same time, faced an increase in sentence based on an adjusted offense level resulting from travel that was not illegal at the time it occurred.[23] Such an approach represents a classic ex post facto violation because it increases the punishment for actions that were not illegal when the conduct occurred.[24] See

_____

[23] As we've noted, the district court treated each individual round trip as its own group. The six middle trips received adjusted offense levels of 37 each. Applying the multiple-count adjustment of U.S.S.G. § 3D1.4, the probation officer calculated the greater adjusted offense level at 37, with a 5-level increase reflecting Groups 9 through 14, for a combined adjusted offense level of 42. This combined adjusted offense level incorporates the sentences for all of the counts, and is primarily driven (due to the formula of U.S.S.G. § 3D1.4) by the sentences for the seven trips that took place prior to the amendment of the statute.

[24] This ex post facto violation is not cured by the decision in United States v. Regan, 989 F.2d 44 (1st Cir. 1993). In Regan, the court found no ex post facto violation when the defendant's sentence was increased based on acts of embezzlement that pre-dated the enactment of the guideline provision, because the prior acts, as part of the same on-going scheme of embezzlement, were "relevant conduct" that would enhance the defendant's sentence. Id. at 48. The rationale in Regan is not applicable here, however, because Hersh's pre-statute travel acts were not used to enhance his sentence as relevant conduct under U.S.S.G. § 1B1.3. Rather, those occurrences were used to increase the adjusted offense level under the grouping rules, U.S.S.G. §§ 3D1.2, comment. (n.8) and 1B1.2(d). Regan did not address the application of the ex post facto clause in relation to the grouping guidelines, see 989 F.2d at 48-49, and we do not expand its holding to those provisions in this case -- where, as noted above, those provisions were improperly applied.

27

De La Mata, 266 F.3d at 1286.  Even the government now concedes that this approach is "problematic."

Quite simply, because the grouping guidelines are not applicable where a single-object conspiracy is alleged, and because sentencing a defendant separately based on events that took place before the amendment of a statute violates the ex post facto clause, we hold that the district court erred in dividing Count 10 into eight different groups for sentencing purposes.  Nonetheless, Hersh's sentence as imposed remains valid for the reasons we discuss below.

D.

The district court specifically noted in the revised sentencing order that if its guidelines computations as to Count 10 were reversed on appeal, the court would still achieve the same sentence by granting an upward departure.  Sentencing departures are reviewed for abuse of discretion.  See United States v. Melvin, 187 F.3d 1316, 1320 (11th Cir. 1999).

Under the district court's "alternative" sentencing scheme, Hersh's sentencing calculations are as follows.  Regarding Count 10 as one sentencing group, reflecting only the December 27, 1995 round trip, the base offense level for Count 10 is 15, under § 2A3.2, and the adjusted offense level is 21, reflecting upward adjustments for custody of the victim, victim vulnerability and obstruction of justice. Combining this adjusted offense level with the adjusted offense levels for the other groups (Groups 1-3 are 27 each; Groups 4-6 are 26 each; and Group 7 is 23) under § 3D1.4, five levels are added to level 27 (the highest offense level),

28

because there are more than five groups with offense levels within four levels of 27.[25] This results in a total offense level of 32, which, when combined with a criminal history category of I, yields a sentencing range of 121-151 months. Using this offense level and sentencing range as a starting place, the district court could, as it did, then upwardly depart ten levels based on the several possible grounds discussed below, to achieve an offense level of 42, and a sentence of 105 years' imprisonment.[26]

Hersh argues that the district court abused its discretion in sentencing by imposing this "prophylactic" upward departure, claiming that the language of the district court's revised sentencing order was improper or insufficient. First, Hersh claims that the district court's decision was result-driven due to the court's finding

[25]Under § 3D1.4, Hersh's sentencing calculations begin with the sentencing group with the highest offense level (Group 1, with an adjusted offense level of 27), and are enhanced by the number of the sentencing groups with offense levels within four levels of the highest. Section 3D1.4 caps the number of points that can be added to the combined offense level, however, at five. Thus, in Hersh's case, Count 10 is disregarded because there are already six groups with offense levels within four levels of the highest.

[26]The district court noted in the revised sentencing order that it "would employ an upward departure to impose a sentence outside the guidelines under applicable law to reach the same result [of 105 years' imprisonment]; that is, a departure to Offense Level [4]3 requiring a mandatory life sentence." Although the district court actually stated that it could depart to "Offense Level 33" instead of "Offense Level 43," this is clearly a typographical error, because only level 43 carries a mandatory life sentence under the guidelines. In fact, to reach the same sentence of 105 years' imprisonment, the district court only must depart to level 42, with a range of 360 months' to life. Because the court unambiguously said that it intended to attain the same sentence, we assume that its intended departure level was 42.

In addition, we recognize that the district court did not expressly state from which offense level it was departing, and instead noted the level from which Hersh recommended starting (level 26, which did not use the promoting prostitution provision for Counts 1-5). Nonetheless, because the district court indicated to which level it would depart, we are satisfied that its failure to state from which level it was departing was, if error at all, plainly harmless error. See United States v. Kendrick, 22 F.3d 1066, 1068 (11th Cir. 1994) (noting that if an error "did not affect the district court's selection of the sentence imposed," the error is harmless) (citation omitted).

29

that Hersh's behavior was "egregious and morally reprehensible," and that such an application is forbidden by the guidelines. Second, Hersh says that the court failed to engage in the articulated comparative analysis required before a court may depart upwardly. Finally, Hersh argues that the district court failed to adhere to proper procedures in the departure, and departed upwardly because the criminal history category did not adequately reflect the seriousness of the offense without explaining its reasoning. Thus, Hersh urges us to vacate the sentence and remand for resentencing.

We are not persuaded. We begin by observing that a district court has wide discretion in departing vertically on the sentencing guidelines chart. As we held in United States v. Taylor, 88 F.3d 938, 948 (11th Cir. 1996), "once a sentencing court begins the vertical departure on the guidelines chart, it 'need not explicitly discuss [its] reasons for bypassing incremental offense level sentencing ranges.'" Id. (citation omitted). We reiterated this holding in Melvin, 187 F.3d at 1323, squarely rejecting the defendant's argument that "the sentencing court was required to utilize some mathematical formula to account for the departure." Thus, unlike horizontal departures, vertical departures do not require the district court to make explicit explanations for the departures it makes.

In the instant case, the district court offered three independent and altogether sufficient reasons justifying its upward departure.[27] First, it discussed the serious

---

[27]The district court also discussed a fourth reason for its proposed departure -- the likelihood of recidivism. Under U.S.S.G. § 4A1.3, a district court can depart horizontally on the sentencing guidelines chart based on a "concern that [the] criminal history category d[oes] not reflect [a defendant's] recidivism." United States v. Riggs, 967 F.2d 561, 563 (11th Cir. 1992). This

nature of Hersh's twenty-year history of sexual predation, abuse and exploitation, and explained that it could depart on this ground even though the adjusted offense levels of Counts 6-9 already incorporated a five-level increase for seriousness under § 2G2.2(b)(4). Under U.S.S.G. § 2G2.2, comment. (n.2), "an upward departure may be warranted if the defendant received an enhancement under subsection (b)(4) but that enhancement does not adequately reflect the seriousness of the sexual abuse or exploitation involved." Applying this provision, the district court found that "the enhancement does not adequately reflect the seriousness of the sexual abuse or exploitation of minor young males by Hersh in the foreign countries and this country, and that an upward departure under that guideline is warranted." The district court went on to detail the victims affected by Hersh's twenty-year history of sexual abuse, including Moises, Juan, Erlin, and David, and including the numerous minor males from the United States, Honduras, Mexico and the Dominican Republic who were subjected to sexual abuse by Hersh even though these acts were not charged in the indictment. The district court also noted that Hersh continued to travel to Honduras to engage in sexual relations with David while he was still a minor, when, notably, Hersh was under law enforcement scrutiny after Juan had been removed from his custody. Based on these findings,

---

provision, however, is not a proper basis for departure in this case because, as we noted in Taylor, 88 F.3d at 947-48, the district court must perform a very detailed analysis when it departs horizontally rather than vertically. Here, the district court did not make a detailed calculation of this horizontal departure, and thus cannot rely on this ground for its proposed departure. Nevertheless, as discussed in the text, the invalidity of the district court's proposed departure on this ground is not fatal to the entire departure. See Kendrick, 22 F.3d at 1068 ("[W]e do not believe remand is mandated whenever a sentencing court considers both valid and invalid factors. . . . A sentencing error is harmless if the record as a whole shows that the error did not affect the district court's selection of the sentence imposed.") (citations omitted).

31

the district court's proposed departure on this ground was plainly appropriate. See United States v. Stewart, 201 F.3d 442 (6th Cir. 1999) (unpublished table decision) (upholding a district court's additional two-level departure where the district court found that the defendant's sexual exploitation was "aggravated, it was prolonged, it was repeated over several years, at least, and 2G2.2 does not take into account the degree of exploitation and abuse found in this case").

Second, the district court discussed the extraordinary vulnerability of Hersh's victims as an independent basis for departure. In support of departure on this ground, the district court noted that it had "already assessed the multiple vulnerable victims involved in this case as part of the Guideline calculations," and then noted Melvin's recognition that "[i]nclusion of a factor in the Guidelines calculation does not proscribe departure based on consideration of the factor [since a] sentencing court may depart based on a considered factor if the factor is 'present to an exceptional degree or in some other way makes the case distinguishable from an ordinary case where the factor is present.'" 187 F.3d at 1322 (quoting Koon v. United States, 518 U.S. 81, 96, 116 S. Ct. 2035, 2045, 135 L. Ed. 2d 392 (1996)).

Having quoted Melvin at length earlier in the order, the district court observed:

> For different reasons, I join District Judge Steven D. Merryday's assessment in Melvin, as to why the factors in this case are "exceptional" and "distinguishable" from the ordinary case. I find the offenses involved in this case to be so reprehensible as to "gravitate at or near the very bottom of the rung of human behavior that I have had occasion to see." Id.

> Hersh continually has engaged in willful conduct to lure and

32

entice particularly vulnerable young boys into sexual relations with him over a twenty-year period.  His long term conduct is egregious and morally reprehensible.  The Third World minor victims were especially vulnerable because of their poverty and lack of sophistication.

Hersh is more than a pedophile conspiring to have sex with minors.  He is a predator of the young and unfortunate.  He is a member of a group of pedophiles that have combined their information and resources to sexually exploit minor victims in Third World countries.  Hersh's just punishment requires that he spend the remainder of his life where he can do no more harm.

(Footnotes omitted).  The district court's observations unquestionably comport with <u>Melvin</u> and its holding that a district court may upwardly depart under U.S.S.G. § 5K2.0 where the district court finds that the guidelines do not sufficiently reflect the vulnerability of the victims.[28]  Indeed, based on the district court's detailed findings, we conclude that the proposed departure was appropriate.[29]

_____

[28]U.S.S.G. § 5K2.0 reads, in part:

Under 18 U.S.C. §§ 3553(b), the sentencing court may impose a sentence outside the range established by the applicable guidelines, if the court finds "that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." . . .

Where, for example, the applicable offense guideline and adjustments do take into consideration a factor listed in this subpart, departure from the applicable guideline range is warranted only if the factor is present to a degree substantially in excess of that which ordinarily is involved in the offense.

<u>Id.</u>  Although the district court did not expressly say that it was departing under § 5K2.0, as the court did in <u>Melvin</u>, that conclusion seems inevitable, given the district court's extended quotation from <u>Melvin</u> and its particular adherence to the language of <u>Melvin</u>.

[29]Hersh further contends that the district court's explanation for this departure was insufficient because the district court failed to draw contrasts with facts of non-departure cases or explain why these facts fell outside the heartland of cases under the same guidelines, citing <u>United States v. Alfaro-Zayas</u>, 196 F.3d 1338, 1343 (11th Cir. 1999) ("A sentencing court

33

Third, the district court discussed as a basis for departure disregarded counts of conviction. Under Hersh's revised sentencing calculations (which keep Count 10 as one sentencing group), Hersh's combined sentence completely disregards Count 10. This occurs because U.S.S.G. § 3D1.4 caps the number of groups that are used in calculating a defendant's combined offense level. Yet, the Commentary to U.S.S.G. § 3D1.4 recognizes that such a disregard of certain counts may occur undesirably, and explicitly instructs a district court to upwardly depart if the combined offense level is "inadequate."[30] Count 10, the count charging Hersh's conspiracy to travel to Honduras for the purpose of engaging in

_____

determines whether a case falls outside the heartland of the Sentencing Guidelines by carefully assessing the facts of the case and 'comparing those facts to the facts of other cases falling within the guideline's heartland.'") (citation omitted). We do not share Hersh's characterization of the district court's explanation. As evidenced in the text quoted above, the district court expressly made comparative comments finding that: (1) the case as a whole involved factors that were "exceptional" and "distinguishable" from the ordinary case; and (2) the victims were "particularly vulnerable" because of their poverty and lack of sophistication. These findings plainly represent comparative findings illustrating that this case, in the district court's judgement, falls outside of the heartland of the sentencing guidelines.

Hersh provided us with three cases involving crimes of child pornography and sexual abuse as supplemental authorities, in an effort to highlight that the factual circumstances of his case are not outside of the "heartland." We disagree with Hersh, as the cases he has provided, United States v. Johnson, 221 F.3d 83 (2d Cir. 2000), United States v. Garrett, 190 F.3d 1220 (11th Cir. 1999), and United States v. Canada, 110 F.3d 260 (5th Cir. 1997), deal with more limited instances of abuse. In Garrett and Canada, the defendants were apprehended before any abuse occurred, since the minors were actually investigators posing as minors over the internet. In Johnson, the defendant went through with various sexual encounters with minors, but apparently did not bring any victims into his house, under his custody, to engage in sexual abuse for a prolonged period of time. Therefore, comparing Hersh's conduct with that of other defendants sentenced under the same guidelines, we agree with the district court that it falls well outside of the heartland of cases.

[30]In part, the commentary to § 3D1.4 reads:

> In unusual circumstances, the approach adopted in this section could produce adjustments for the additional counts that are inadequate or excessive. . . . Situations in which there will be inadequate scope for ensuring appropriate additional punishment for the additional crimes are likely to be unusual and can be handled by departure from the guidelines.

34

sexual acts with minors, covers Hersh's repeated sexual abuse of Juan, David, and Erlin, and is an integral part of the crimes for which Hersh has been convicted and sentenced. Thus, we find that a combined offense level disregarding this count would be inadequate, and we uphold the district court's proposed departure on this ground.

Simply put, based on the wide discretion afforded the district court in sentencing, and on the analysis contained in the district court's detailed and comprehensive revised sentencing order, the district court's proposed upward departures are proper. Moreover, because the district court's departure of ten levels (from offense level 32 to offense level 42) is well below the fifteen-level departure in Melvin, and because the final sentence of 105 years' imprisonment is not above the combined statutory maximum for all of the counts, Hersh's sentence is not unreasonable. See Melvin, 187 F.3d at 1323 (citing United States v. Garrison, 133 F.3d 831, 853 (11th Cir.1998) (finding a departure increasing a fine to the statutory maximum reasonable); United States v. Taylor, 88 F.3d 938, 948 (11th Cir.1996) (finding an eight-level departure reasonable where the sentence was below the statutory maximum)). Finally, because the district court's upward departures and final sentence are firmly grounded in the provisions of the sentencing guidelines and the case law, we cannot say that Hersh's sentence is inappropriate. Cf. U.S.S.G. § 5K2.0, comment. ("[P]reference for a different sentence than that authorized by the guidelines is not an appropriate basis for a sentence outside the applicable guideline range.").

35

In short, we find that Hersh's sentence of 105 years' imprisonment, as derived from the district court's proposed upward departure, is without error and need not be remanded for resentencing. See Kendrick, 22 F.3d at 1068; see also United States v. Thompson, 994 F.2d 864, 868 (D.C. Cir. 1993) ("Because the judge made it clear he would impose the same sentence under either criminal history category, it would be futile to remand for resentencing and we are not required to do so.").[31]

---

[31]Hersh also argues that (1) the evidence regarding the receipt and possession of child pornography counts was insufficient, (2) the district court abused its discretion by admitting pedophilia-propensity evidence in violation of Fed. R. Evid. 404(b), and (3) the district court erred by applying the "promoting prostitution" guideline to several of the counts. We can find no merit in any of these arguments and dispose of them briefly.

First, the evidence introduced at trial plainly established that Hersh knowingly received and possessed the images, that the images were received and possessed through interstate commerce, that the images portrayed real minors engaged in sexually explicit conduct, and that Hersh was aware of such. See Kent, 175 F.3d at 873 (holding that in reviewing sufficiency of the evidence claims, we view the evidence in the light most favorable to the government and draw all reasonable inferences and credibility choices in favor of the jury's verdict). Appellant recently filed supplemental authority with the Court, submitting two cases, United States v. Henriques, 234 F.3d 263 (5th Cir. 2000), and United States v. Wilson, 182 F.3d 737 (10th Cir. 1999), that require specific evidence that each image is received through interstate commerce, e.g., over the internet, see United States v. Carroll, 105 F.3d 740, 742 (1st Cir. 1997) (holding that "[t]ransmission of photographs by means of the Internet . . . constitutes transportation in interstate commerce"). We have little doubt, however, that circumstantial evidence may be presented to prove this element, and we are fully satisfied that the government provided ample circumstantial evidence of the interstate commerce element in each of Hersh's counts of conviction. See United States v. Henry, 920 F.2d 875, 877 (11th Cir. 1991) ("We . . . note that [an 'element of the crime] may be established, like most other facts, by circumstantial evidence, even if the jury might draw other reasonable inferences from the circumstantial evidence.' 'It is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt, provided a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt.'") (citations omitted); United States v. Utter, 97 F.3d 509, 512 (11th Cir. 1996) ("In judging the sufficiency of the evidence, the standard applied is the same whether the evidence is direct or circumstantial.").

Second, the "propensity" evidence that Hersh challenges was properly admitted under Rule 404(b) as it was used to show Hersh's state of mind and modus operandi, and to rebut Hersh's attack on witness credibility. See United States v. Beechum, 582 F.2d 898, 910 (5th Cir. 1978) ("Where . . . the extrinsic offense evidence is relevant to an issue such as intent, it may well be that the evidence has probative force that is not substantially outweighed by its inherent

In light of this conclusion, as well as our conclusions regarding Hersh's trial, we affirm both the convictions and the sentence.[32]

**AFFIRMED.**

---

prejudice. If this is so, the evidence may be admissible."); see also United States v. Larson, 112 F.3d 600, 604-05 (2d Cir. 1997) (noting Congress's intent to make prior bad acts with minors admissible as relevant and probative, even if the evidence reveals a "propensity" of the defendant). Unlike in United States v. Heidebur, 122 F.3d 577, 581 (8th Cir. 1997), this evidence was not "front-and-center" but used in rebuttal. Additionally, the district court limited the effect of any "propensity" evidence by excluding certain evidence and by clearly instructing the jury that Hersh's actions, and not his character, were on trial. Therefore, we hold that there was no error in the admission of such evidence, and that even if there was error, it was harmless in light of the overwhelming evidence establishing Hersh's guilt. See United States v. Hubert, 138 F.3d 912, 914 (11th Cir. 1998).

Third, the district court applied U.S.S.G. § 2G1.1, the provision entitled "Promoting Prostitution or Prohibited Sexual Conduct," to determine the offense levels for Counts 1-5. "Promoting prostitution or prohibited sexual conduct" means "(A) transporting a person for the purpose of prostitution or prohibited sexual conduct, or (B) persuading, inducing, enticing, or coercing a person to engage in, or travel for the purpose of engaging in, prostitution or prohibited sexual conduct." U.S.S.G. § 2G1.1, comment. (n.1). The language of this provision, which provides punishment for either prostitution or prohibited sexual conduct, plainly applies to Hersh, who engaged in prohibited sexual conduct by "exchang[ing] money, gifts and access to luxury accommodations in exchange for sexual favors with minor Honduran males," as the district court found. And, contrary to Hersh's argument, nowhere do the guidelines or any cases require that the promotion of prohibited sexual conduct involve a commercial enterprise.

We also note that the Supreme Court's recent decision in Ashcroft v. Free Speech Coalition, -- U.S. --, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (2002), is not at issue here. Free Speech Coalition held that the prohibitions of 18 U.S.C. §§ 2256(8)(B) and 2256(8)(D) involve a ban on virtual child pornography, and as a result, are overbroad and unconstitutional. See id. at 1405-06. In the instant case, as discussed above, there was compelling evidence that the images portrayed real children in all of the child pornography counts (Counts 6-9). Thus, Hersh's convictions on these counts are not invalid in light of Free Speech Coalition. We add that defense counsel conceded at oral argument that the impact of the decision is not "a major issue" in this case.

[32]Additionally, we grant the government's motion to supplement the record under seal with trial exhibits.

37