**UNITED STATES of America, Appellee,**

v.

**Peter J. REGAN, Defendant, Appellant.**

**No. 92–2025.**

United States Court of Appeals,
First Circuit.

Heard Jan. 6, 1993.

Decided March 29, 1993.

Defendant, during the period covered by the indictment, viz., November, 1987 to July 16, 1991, was a senior vice president in charge of the Special Loan Services Division of the Shawmut National Bank. As head of this division, defendant directly supervised and controlled the collection and "work-out" of delinquent and problem commercial loans. Because of the individuality of this work and defendant's seniority, he was extraordinarily unsupervised, all the way from his actions in causing debits or credits to Shawmut's cash collateral account, down to his maintaining personal custody of the files. During the period in question he exercised this freedom in a number of manners so as to embezzle some $2,500,000 from the Bank. On July 16, 1991, by reason of a conspicuous act, he was discovered. He was promptly indicted and, in due course, pleaded guilty.

George F. Gormley, Cambridge, MA, with whom John D. Colucci, New York City, was on brief for defendant, appellant.

Ralph F. Boyd, Jr., and Robert J. Lynn, Asst. U.S. Attys., and A. John Pappalardo, U.S. Atty., Boston, MA, were on brief, for appellee.

Before BOUDIN, Circuit Judge, ALDRICH, Senior Circuit Judge, and STAHL, Circuit Judge.

BAILEY ALDRICH, Senior Circuit Judge.

Defendant Peter J. Regan, who pled guilty to 55 counts of bank embezzlement (18 U.S.C. § 656) on February 18, 1992 with no reservations or conditions now relevant, appeals with respect to his U.S. Sentencing Guidelines sentence of 40 months, (a) because he was not allowed a hearing on oral testimony with respect to his claimed deduction on account of diminished capacity; (b) because he was sentenced under guidelines issued later than the dates of some of his actions, and (c) because there were enhancements made for abuse of trust and for more than minimum planning. We affirm.

### Diminished Capacity

Defendant first challenges the district court's refusal to hold an evidentiary hearing on his entitlement to a downward departure for diminished mental capacity. Sentencing Guidelines § 5K2.13 provides as follows:

> § 5K2.13. *Diminished Capacity* (Policy Statement)
>
> If the defendant committed a non-violent offense while suffering from significantly reduced mental capacity not resulting from voluntary use of drugs or other intoxicants, a lower sentence may be warranted to reflect the extent to which reduced mental capacity contributed to the commission of the offense, provided that the defendant's criminal history does not indicate a need for incarceration to protect the public.

The burden of proving causation is on the defendant, and there can be no appeal from the district court's denial of a reduction. *United States v. Lauzon,* 938 F.2d 326, 331 (1st Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 450, 116 L.Ed.2d 468 (1991); *United States v. Shattuck,* 961 F.2d 1012 (1st Cir. 1992). However, "[w]hen any factor important to the sentencing determination is reasonably in dispute, the parties shall be given an adequate opportunity to present in-

formation to the court regarding the factor.'' U.S.S.G. § 6A1.3(a). Except with respect to cross-examination, *post,* defendant does not claim that his presentation was substantively curtailed; his complaint is that the refusal to hear it on oral testimony was an abuse of discretion. *United States v. Gerante,* 891 F.2d 364, 367 (1st Cir.1989); *see also* Fed.R.Crim.P. 32(a)(1).

In the written record there was the presentence report containing a lengthy statement from defendant and favoring and unfavoring opinions of experts. The court chose to accept the latter, concluding,

> I have no confidence at all ... in that defense. I have no doubt that this case has had a severe and traumatic effect on Mr. Regan, but I fear that that all took place after he was caught. I do not believe he was diminished in his capacity. I accept the report of Doctor Strasburger. And during the course of his criminal conduct, he was not diminished in his capacity.

We review the evidence as the best approach to defendant's contention that the court abused its discretion in denying oral presentation. Basically, defendant contends diminished capacity produced a delusional conviction that the country was faced with economic, and hence political, chaos for which he must fortify himself. In the late 1970s and early 1980s he stored dried foods in his cellar, ultimately several years' supply, stored firewood, and made arrangements for water and other necessities. These were all acquired with defendant's own earnings. Commencing in November 1987, however, defendant exercised what the record shows to have been highly skillful and comprehensive methods—hence the 55 counts—to divert Bank funds. Their ingenuity and effective concealment, evoking no suspicions, show remarkable ability. The proceeds largely were salted away in Swiss bank accounts. Shortly after his discovery and discharge by Shawmut, defendant voluntarily entered McLean Hospital, where he was found to be profoundly disturbed. At first his condition

was too serious to assist in his defense, but after two admissions he sufficiently recovered, and ultimately was allowed to plead.

In connection with the coming sentence hearing defendant submitted records from McLean Hospital and letters from three psychiatrists. The earliest was from a McLean Hospital doctor, Joseph Triebwasser, dated August 9, 1991, at which time defendant was severely psychotic, indicating that this severe illness was consistent with his alleged criminal activities prior to his admission. This brief letter was addressed to insurance coverage and is of no substantial value. On November 21, 1991 Dr. Martin J. Kelly addressed a letter to the court with relation to defendant's then inability to participate in legal activities. This was followed by a letter from Dr. Kelly with reference to sentencing, dated December 13, 1991 in which the doctor spoke of defendant's competence, his high intelligence, and his ability

> to function, except when it deteriorates into psychosis as it has from time to time over the past 10 years....[1]

> It is difficult to say that Mr. Regan did not have the capacity to known (sic) the nature and quality of his acts or did not have the capacity to know that what he was doing was wrongful in light of his own behavior, his capacity to function at work, and as mentioned, his intelligence. But, the behaviors seem to me in large measure driven by his psychiatric problems which occasionally deteriorate to the point of faulty realty testing and frank psychosis. However, for much of the past 10 years he has *not* been in a psychotic state and during those periods was also involved in hoarding money as well as provisions and arming himself in anticipation of the looming economic collapse and resultant anarchy. (Emphasis in original).

This was followed by a letter from Dr. Pierre V. Mayer in which he said,

> I wanted to let you know that I have received Dr. Kelly's report and essentially agree with his findings. (I would

1. We interject here that there is no evidence beyond medical opinion, except from defendant himself, that his abilities ever deteriorated or faltered. His associates never observed such.

qualify this by adding that I am not convinced that Mr. Regan did not have some degree of psychosis over the past 10 years).

This less than forceful opinion was followed by a further letter from Dr. Kelly.

In response, the government submitted a report from Dr. Larry H. Strasburger. After indicating that he had reviewed defendant's personal history as given to him in an interview and the medical records, the letters from defendant's experts, and interviews with officers at the Bank who had dealt with defendant, the doctor concluded as follows:

> There was *no information available to* this examiner which would corroborate the existence of a psychosis prior to Mr. Regan's hospitalization in July of 1991. While delusional beliefs and psychotic thinking may have been present prior to the discovery of Mr. Regan's embezzlement, these phenomena were not evidenced to the coworkers whom I interviewed. They stated that Mr. Regan's capacity to think clearly and effectively was an extraordinary one, quite at variance with the psychotic mental state documented on his hospital admissions and during my interviews with him. It is entirely possible, indeed even likely, that his psychosis was precipitated by the discovery of his misappropriation of funds.

> Even were Mr. Regan's psychosis to have existed prior to his embezzlement coming to light, the evidence that it affected his thinking and diminished his mental capacity is confined to his own statements. The bank officers whom I interviewed describe him as an extremely effective thinker, negotiator, and problem solver. Even were he to have held delusional ideas, there is no evidence that his cognitive capacities were impaired by them. It is quite possible that, even if he had entertained delusions, he could also have misappropriated funds simply for personal gain. Given the information available to me, it is not possible to resolve this question from a psychiatric perspective.

Prior to the sentencing hearing defendant moved to present oral testimony of the doctors and for permission to cross-examine Dr. Strasburger. The court denied this motion. At the hearing, after briefly stating its reasons for concurring with Dr. Strasburger, it expressed its ultimate conclusion previously quoted.

Following its decision from the bench, the court allowed defendant to file an offer of proof to permit the court to reconsider. Thereafter defendant filed a further, two page letter from Dr. Kelly, and a seven page, single-space, letter from Dr. Mayer. The former added little. The second was full and detailed, but, at bottom, did not change the picture; there remained two views. We have, therefore, an experienced judge, who spoke thoughtfully, "I have reviewed this record very carefully, and I have done it several times over the past week." The record was unusually extensive. In addition he agreed to receive further proof, and no doubt equally considered it. That this evidence was not allowed to be presented orally was well within the court's discretion. *United States v. Pugliese*, 805 F.2d 1117, 1123 (2d Cir.1986). *See also* U.S.S.G. § 6A1.3 Commentary.

There remains that defendant was not allowed to cross-examine Dr. Strasburger. We have never held it an abuse of discretion to deny cross-examination in sentencing hearings. *E.g., United States v. Zuleta–Alvarez*, 922 F.2d 33, 36 (1st Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 2039, 114 L.Ed.2d 123 (1991). This would not be the case to begin. While offers of proof are not normally required in connection with cross-examining a hostile witness, *see United States v. Colonial Motor Inn, Inc.,* 440 F.2d 1227, 1228 (1st Cir.1971), this was an area where defendant should well know what he would ask or try to elicit from Dr. Strasburger. *Cf. United States v. Shattuck, ante.* In his offer of proof he made no substantive suggestions. We see no error.

In closing this aspect, this is not a case where the defendant was of general diminished capacity, but quite the contrary. His extreme views were on a single subject,

and even here they merely pursued opinions that were held by other doomsayers, and envisioned conditions not unknown to history. Defendant had read depressing books, and his work in the Bank was with economic entities that were moribund, or nearly so. Even if a reduced sentence could be warranted in the case of a single delusion, it does not follow that a delusion means psychosis. In any event, according to his own expert, defendant continued his conduct, which he knew to be wrongful, during intervals when, concededly, he was not psychotic. This is an unusual case, and we have given it much attention, but the court had defendant's case fully before it, and we believe that to complain about a breach of discretion in not receiving it orally is truly frivolous.

### Continuing Offense

■ During Regan's embezzlement activities the United States Sentencing Guidelines § 2B1.1(b)(1) was amended with the result of increasing the base level enhancement for the amount here embezzled from twelve levels to fifteen. *See* U.S.S.G. Manual, Appendix C, pp. 39–40, Amendment No. 99 (effective Nov. 1, 1989). The court applied the amendment, and defendant complains this was an *ex post facto* deprivation. The *ex post facto* clause of the Constitution "forbids the application of any law or rule that increases punishment for pre-existing conduct." *United States v. Havener,* 905 F.2d 3, 5 (1st Cir.1990); *Miller v. Florida,* 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987). Where a "continuing offense" straddles the old and new law, however, applying the new is recognized as constitutionally sound. *E.g., United States v. Arboleda,* 929 F.2d 858, 871 (1st Cir. 1991). *See also United States v. Fazio,* 914 F.2d 950, 959 n. 14 (7th Cir.1990) (collecting cases). We agree with the defendant that the cases relied on by the government can arguably be distinguished in the sense that all involved true straddles where the offense itself began before the increase in sentence but concluded afterwards. The government says that this was all one scheme, though variously carried out, to use defendant's office to embezzle from his employer. However, pursuant to the substitute indictment, defendant was formally sentenced for some offenses that were completed before the guideline increase and, if the prior guideline were applied (either to all the counts or through some "blended" method), his sentence would be lower.

Nevertheless, we think it constitutional that the defendant be subject to the sentence actually imposed even if no increased penalty is permitted for the convictions that occurred before the guideline increase. Under the guidelines the prior acts of embezzlement were "relevant conduct" that would enhance defendant's sentence for the embezzlements that occurred after the guideline increase even if he had been convicted *only* on the latter counts. U.S.S.G. §§ 1B1.3(a)(2); 3D1.2(b), (d). These two guidelines taken together base the sentence on the full amount embezzled during the same course of conduct or as part of the same scheme or plan even if a defendant is indicted and convicted on just one of the counts. *See* U.S.S.G. § 3D1.2, Note 4, example 4. In this instance, however pleaded, the defendant's embezzlements were manifestly part of the same ongoing scheme of embezzlements.

The guidelines' criminal history provisions are routinely applied to increase sentences based upon convictions that occurred before the guidelines were adopted. *Cf. United States v. Ykema,* 887 F.2d 697, 700 (6th Cir.1989), *cert. denied,* 493 U.S. 1062, 110 S.Ct. 878, 107 L.Ed.2d 961 (1990); *United States v. Cusack,* 901 F.2d 29, 32 (4th Cir.1990). For example, a repeat offender statute may increase the sentence for a later crime based on convictions that occurred before the statute was enacted. *See United States v. Ykema, ante,* (citing cases). In those cases, as in this one, the defendant has fair warning at the time he commits his later acts that the prior ones may or will be used in determining his sentence for the latter ones. *Cf. Amaral v. I.N.S.,* 977 F.2d 33, 36–37 (1st Cir.1992). Accordingly, there is no *ex post facto* violation in this case. It may be that some of defendant's earlier 40 month sentences

could not be supported, but they are to be served concurrently, and as defendant has not suggested prejudice we do not pursue the matter.

### Enhancements

Finally, defendant complains that there should have been no enhancements under U.S.S.G. § 3B1.3 "for abuse of trust," and under § 2B1.1(b)(4) for more than minimum planning. Defendant, in talking about abuse of trust, which he says is already included in embezzlement, neglects that § 3B1.3 includes "special skill." The court dealt unanswerably with defendant's special skill. Defendant complains, equally unwarrantably, that the size of the embezzlement, for which his sentence was increased, necessarily assumed planning, so that to add more for the planning was redundant. There could be no end to such a contention.

*Affirmed.*